UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Central Illinois Carpenters Health & Welfare Trust Fund, et al, | ) ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Case No. 05-1094 |
| | ) | |
| Helen Struben, individually; S&S Fashion Flooring, Inc.; and Flooring Products, Inc., | ) ) | |
| Defendants | ) | |

## OPINION AND JUDGMENT ORDER

The parties have consented to have this case heard to judgment by a United States Magistrate Judge, pursuant to 28 U.S. §636(c), and the case was referred to me. A bench trial was conducted on September 29, September 30, and October 1, 2008. The parties have each tendered proposed findings of fact and conclusions of law, and this Opinion follows.

## JURISDICTION and VENUE

This is an action that arises under the Employee Retirement Income Security Act of 1974 ["ERISA"], as amended, 29 U.S.C. §1145. ERISA provides that an employee benefit plan, such as the Plaintiffs in this case, may sue or be sued as an entity. 29 U.S.C. § 1132(d). The complaint also includes state law claims.

The Court has original federal question jurisdiction over the ERISA claim pursuant to 28 U.S.C. § 1331. The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

Venue is proper in this court. Plaintiff Funds are administered in this District and the Locals have employees in this District whose relevant work was performed in this District. Defendant Helen

Struben is a resident of this District. Both corporate Defendants operated their business within this District.

**FINDINGS OF FACT**

Plaintiffs are two union locals - Carpenters Local 63 and Carpenters Local 644 - and a number of employee benefit funds: Central Illinois Carpenters Health & Welfare Trust Fund; Mid-Central Illinois District Council of Carpenters; Mid Central Illinois District Council of Carpenters Apprenticeship Fund; Central Illinois Carpenters Annuity Fund; Carpenters Fringe Benefit Fund (collectively, "Funds"). The Funds are administered pursuant to the terms and provisions of various Agreements and Declarations of Trust. They must also be maintained and administered in accordance with the provisions of the Labor Management Relations Act of 1947 and the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 et seq. (ERISA).

Defendant S&S Fashion Floors, Inc. ("S&S") is an employer engaged in an industry within the meaning of ERISA, 29 U.S.C. §§ 1002(5), (11), (12), and (14). S&S employed individuals who were members of and represented by one of the two Carpenters' Locals.

On April 17, 1995, S&S, by its President Helen Struben, entered into an Agreement "adopting all collective bargaining agreements to which the Mid-Central Illinois District Council of Carpenters was a party." (Plaintiffs' Exhibit 5, page 1). One such agreement was the Collective Bargaining Agreement in effect from May 1, 1998 through April 30, 2003 (which covers the entire period at issue in this case). The Agreement and the Collective Bargaining Agreement ("CBA") are Plaintiffs' Exhibit 5. S&S does not dispute that it was, during the relevant period of time, bound by the terms of that CBA.

2

Several pertinent portions of the CBA are contained in Article II, which is captioned "SCOPE OF AGREEMENT". Those sections read as follows:

Section 2:    This Agreement shall apply to all construction, repair, and rehabilitations and all industrial maintenance work not covered by a maintenance agreement.

Section 3:    This Agreement shall cover all employees employed by the Employer engaged in work coming under all classifications listed under the trade autonomy of the United Brotherhood of Carpenters and Joiners of America.

Section 5:    The trade autonomy of the United Brotherhood of Carpenters and Joiners of America consists of the milling, fashioning, joining, assembling, erection, fastening or dismantling of all material of wood, plastic, metal, fiber, cork and composition, and all other substitute materials.

Section 6:    The Unions claim of our jurisdiction extends over all the divisions and subdivisions of the trade including the following: ...Tile, Marble, Terrazzo, Finishers, Shopworkers, Granite Cutters;... all those engaged in the operation of woodworking or other machinery required in the fashioning, milling or manufacturing of Products used in the trade, and the handline, erecting and installing of materials on any of the above divisions or subdivisions...The layout work for all buildings, houses and apartments...The installation of all sheet piling and bracing of same. The installation of all shoring, underpinning and lagging. The installation of all caissons...The fabrication, erection, stripping and dismantling of all concrete forms whether of wood, metal or composition including form materials for houses, apartment building and structures of all sorts. ..The fabrication and erection of all framework for houses or apartments of any and all descriptions. The erection of all prefabricated components for houses or apartments or other buildings...The installation of all materials for exterior trim on houses or apartments...The installation of all material for interior trim on houses or apartments, including, but not limited to paneling, drywall, flooring, mouldings, doors and frames... The installation in all buildings of floor covering materials no matter what the method of installation, and whether of wood, linoleum, asphalt, rubber, vinyl, asbestos and other materials. The installation in all buildings, houses and apartments of rugs or carpets of all types and descriptions...

Section 7:    FLOOR COVERING SCOPE OF WORK. The installation in all buildings, houses and apartments. To consist of installation, preparation, measuring, cutting, fitting, taking up and relaying of all carpets, rugs of all types, synthetic and natural fibers, woods, resilient floor coverings, linoleum, asphalt, rubber, vinyl, vinyl backed, cork, vinyl composition, no matter what combinations.

3

In Article XXII of the CBA, S&S agreed to be bound by the Trust Agreements that established the Plaintiff Funds. This Article required S&S to remit fringe benefit contributions to the Funds at specified rates. Article XXII Section 4 authorized the Trustees of the Funds to examine the books of S&S or to have a CPA do so. If a discrepancy was discovered during such an audit, the cost of the accounting was to be borne by the Employer.

S&S also entered into a Participation Agreement, another document obligating it to make contributions to the Plaintiffs. Pursuant to ERISA, those contributions were required to be made in accordance with the Funds Agreement and Declaration of Trust. In the event contributions were untimely, the Plaintiffs had the statutory right to sue for delinquent contributions and to recover liquidated damages over and above any delinquency. 29 U.S.C. § 1145. The Agreement and Declaration of Trust authorizes the Plaintiff Funds to examine the payroll books and records of a covered employer to determine compliance with those statutory obligations.

On April 16, 1998, Helen Struben, as President of S&S, signed another document entitled "ARTICLE XVII DURATION". (Plaintiffs' Exhibit 5, p.31) This document is in different typeface than the documents discussed above. It is not clear where this document fits in. Article XVII of the CBA is entitled Grievance Procedure, so it certainly is not intended to replace or add to that Article. The last Article of the CBA is Article XXXVI, so it is not simply an addendum to the CBA. Perhaps the heading was a typographical error, intended to be Article XXXVII, but there was no clarifying testimony on this matter, and no CBA other than Plaintiffs' Exhibit 5 is in evidence. The Document provides that the Agreement is effective August 1, 1997 through July 31, 2000 and is continued year to year thereafter unless terminated. Handwritten at the bottom of the document is "S&S Residential."

4

That handwriting does not appear to be that of either Helen Struben or the union representative Perry Sundell.

S&S submitted monthly contribution reports and payments in order to satisfy its contractual obligation to the Funds. S&S was required to make contributions to the Funds in accordance with the terms and conditions of the Funds' agreements and declarations of trust. Under the agreements and declarations of trust, S&S is liable for interest on delinquent contributions, as well as liquidated damages, attorney fees, and audit costs related to efforts to collect those contributions.

S&S was a C corporation, the sole owner of which was defendant Helen Struben. The Articles of Incorporation (Plaintiffs' Exhibit 1) shows that $7500 worth of common stock was issued on February 17, 1995. Helen Struben paid that amount into the company. No other incorporators or officers are shown on the incorporating documents. Helen's individual tax returns show that she took a salary of $8,547 in 2000, $15,159 in 2001, and $17,786 in 2002.

The business address shown on the Articles of Incorporation was 9705 Goetze Road in Green Valley, Illinois. The Green Valley address was owned by Anna Seelye, who was apparently Helen Struben's mother[1]. When Seelye died, Helen acquired ownership of the farm. S&S used a large (approximately 42'-78') machine shed on the property. The arrangement, according to Helen's son, Randy Struben, was that S&S fixed up the building, creating warehouse and office space, and maintained the grounds; in return, S&S did not pay rent. S&S had its own power supply to the building, and S&S paid insurance on the building.

---

[1]Actually, it was Randy Struben's grandmother's farm. Her name was Anna Seelye. The precise relationship to Helen was not established. This oversight is immaterial to resolution of this case.

5

S&S was a floor laying business. Initially, S&S worked on both commercial and residential jobs. In 1999, the company had enough residential work that 6,700 square feet of retail space was leased at 930 South Second in Pekin, Illinois. The shed in Green Valley became the center for commercial jobs. The building in Pekin housed a number of small businesses besides S&S, including a nail salon, a donut shop and a garage. In 2001, this property was acquired by Struben Properties, which was a company owned by Randy Struben. Thereafter, the garage tenant left and S&S took over another 1,500 square feet of space. Then the donut shop left and Flooring Products Inc. (FPI), another company owned by Randy Struben, took over that space.

According to S&S financial records, S&S put in over $11,000 in capital improvements to that leased property in Pekin, although there is no documentation of those improvements. Randy described the lease arrangement between S&S and Struben Properties as follows: in addition to paying $500 per month rent, any improvements made by S&S remained with the owner. In addition, S&S was responsible for the real estate taxes, according to Randy. (Transcript p.517). There is no documentation of this arrangement (Transcript p.538), other than a single item in the check register showing payment of real estate taxes.

Randy explained that S&S employees fell into several categories: estimators (who bid the work), installers (who physically installed carpet and other types of flooring), warehousemen (who loaded and unloaded trucks and otherwise saw to inventory), and property maintenance employees. Only the job of installing flooring was "covered work" under the CBA; estimating, warehousing and maintenance work was not within the scope of work defined by the CBA. On an installation job, the installers were supervised by Randy or some other foreman. The installers were paid hourly, with one rate for commercial installations and a lower rate for residential installations.

6

The employees did not keep time cards; instead, they (or a job supervisor) would call their time in to Helen Struben. (Transcript p.551). There is nothing in the record that would appear to be contemporaneous recording of this time by Helen; the only documentation of time worked by employees is payroll spread sheets prepared by Helen Struben (Transcript p. 542).

Not all installers were considered by Randy to be employees of S&S, however. Some of them he classified as "independent contractors" who had their own business run from their homes. They carried their own insurance, and when needed, Randy would call them. Randy testified that he (or his dad) would figure out how much material was needed and the cost of that material. They would call the independent installer, tell him about the job and the material, and the installer would provide a quote for the job. Upon completion, S&S would bill the customer and then pay the installer. Payment to these installers was usually made on a 1099, not a W-2.

In addition to these employees, Helen Struben served as bookkeeper, and Robert Breuhaus was a certified public accountant who was retained to prepare taxes, financial reports and the like. Breuhaus also prepared Helen's personal tax returns. Helen, Randy and Randy's sister Yvonne Hand had check writing authority for S&S. Yvonne also backed up Helen in the company's bookkeeping. According to Randy, S&S maintained two bank accounts, one at Green Valley Bank for commercial business and one at Pekin National Bank for residential business. Although there are in evidence check registers for these two accounts, there is no documentation explaining or supporting the distinction between the two accounts.

S&S employed Randy Struben as the field supervisor for S&S, in charge of all day-to-day operations. Early in the company's existence, Randy did the estimating work. As the company's business grew, he no longer had time to estimate. He thought that retired installers would make good

7

estimators, because they knew the work and how long a particular job would take to complete. He therefore began retaining some of the retired installers who had earlier worked for S&S as union members. Once a job was bid, based on the estimator's figures, it might be some time before the company knew if it had the successfully obtained the business. Once the physical work of installation began, the estimator served as supervisor of the job. Randy testified that he included the estimator's time in the cost of a job as labor.

Randy also ran his own business, Flooring Products, Inc. ("FPI"), which he incorporated in 2001 (Plaintiffs' Exh. 33) as an S corporation. FPI did business at 930 S. Second Street in Pekin, Illinois, in space next to S&S; recall that Randy's business Struben Properties owned the building at that address. Randy testified that he invested his own money as capital into FPI; no other investors were involved. There were, according to Randy, no transfers of any kind between the two companies. As was the case with S&S, Helen was FPI's bookkeeper, and Helen, Randy and Yvonne Hand had check writing authority for FPI. The two companies also used the same accountant, but maintained separate bank accounts and phone numbers.

At first, FPI was a distributor of flooring-related products, such as padding, glue and various tools, used by flooring installers including but not limited to S&S. Randy's testimony (Transcript p. 441-444) regarding the relationship between FPI, the manufacturers of these products, and his customers (including S&S) was confusing and contradictory. At several times in his testimony, Randy stated that his customer paid the manufacturer of these products directly, and then the manufacturer paid him. At another time, he testified that S&S paid FPI for these "supplies." In yet another answer, he stated that FPI was paid nothing by S&S for products purchased; all billing went through the manufacturer. Yet another time he testified that FPI would order for a customer, such as S&S, and then

8

the customer would pay FPI. Whatever the payment and ordering arrangement may have been, he stated that there was no difference in the way FPI ordered for or billed S&S, and there was no discount given to S&S.

FPI and S&S filed separate tax returns. Each company had its own tax identification number. Although both companies used the same accountant, separate financial reports were prepared for each company. Annually, the accountant would meet with Helen and Randy to prepare annual reports for S&S; his meeting regarding FPI was only with Randy. In addition, this same accountant prepared Helen's personal tax returns.

All information reflected in S&S tax returns and financial statements was provided to the accountant by Helen; he did no audits or independent investigations into the companies' records. S&S financial statements showing "compensation of officers" include Randy, as devoting 75% of his time to corporate business, although once again, Randy stated that he did not know why the accountant did that, and the accountant testified that it was a "mistake."

Until 2002, FPI (which was never signatory to a CBA) did not install flooring.  Through the first quarter of 2002, S&S did both residential and commercial installation jobs. After the first quarter of 2002, Randy testified that FPI began "subcontracting residential work" (Transcript, p.445, 538) and installing floor coverings.   As was the case with installation jobs at S&S, Randy served as field supervisor for FPI's installation jobs as well.

According to Randy, all FPI flooring installations were residential jobs; FPI did no commercial work.  Although Randy testified that S&S did no residential work after the first quarter of 2002, S&S documents establish that S&S continued to do residential work throughout 2002 (Plaintiff's Exh. 16,

p.47-49).  And while Randy testified that the two companies did not share customers or work on the same jobs, he also stated that FPI "subcontracted" residential work from S&S.

Randy testified that S&S paid FPI for "subcontract labor for residential" jobs. (Transcript p. 448). At another time, he testified that if S&S installers were laid off and wanted to do residential work, he would hire them to work. (Transcript p. 489). Although FPI employed some of the same installers that S&S had employed to do its installation work, FPI never made contributions to the union Funds. Randy testified that this was either because residential installation is not covered under the collective bargaining agreement or because these employees were not union employees.

At around this same time, FPI began renting warehouse space from Helen Struben at the Goetze Road farm in a building separate from the building being used by S&S. FPI paid $200 per month rent for this building.

S&S purchased a 2001 Ford pickup truck, taking out a loan from Pekin National Bank to do so. The loan documents were signed by Randy Struben; he was identified on those documents as "Secretary" of S&S, although he denied holding such an office. That same designation shows up in S&S tax returns; Randy testified the accountant must have "assumed" he held that office, but that the designation was not accurate. The S&S tax returns were signed by Helen Struben. Both Helen and Randy testified that they did not read the return before Helen signed it.

On March 25, 2002, the Funds sent a letter to S&S, notifying it that an examiner from Romolo & Associates would be conducting a random examination of the company's records. The letter listed 11 types of documents that would be subject to review: payroll journals, individual earnings and time records for all employees; W-2 and W-3 forms; quarterly employer's federal withholding and Fica tax returns (Form 941); quarterly employer's contribution and wage reports for state unemployment

compensation Form UI-3); employer's copies of monthly contribution report to the Funds; all pertinent personnel file information; cash disbursement records; payments to subcontractors (Form 1096 and 1099); most recent union contract; and federal income tax returns.

The examiner, Larry Williams, arrived to perform the audit on May 15, 2002. S&S was not ready for him, and he had to return on May 20. On that date he reviewed S&S records. His preliminary summary ("Fringe Benefit Compliance Examination Sheet", Defendant's Exh 45, p58-9) showed that no time cards were available and that other records were "good" for 2001-2002 but only fair for the years 1997 through 2000. His explanation for his preliminary finding of delinquency of $56,832.87 was "not reporting all hours."

Williams then prepared a formal report for the Funds, dated July 23, 2002. (Plaintiff's Exhibit 3). Because there were no itemized time cards, Williams had to resort to use of the S&S payroll journal, which did not show the type of work that was done. If Williams could not determine from the journal or from some other document what type of work an employee performed, then he considered all hours worked as covered work at the commercial scale, leading to a delinquency that, with interest and liquidated damages, totaled $57,130.75. Some other individuals were paid during the same calendar year on both a 1099 form (indicating they were subcontractors) and on a W-2 form (indicating they were employees). Williams assumed these individuals could not have been both but were actually employees for whom Fund contributions were due.

Williams testified that Helen told her these individuals were retired carpenters who were now doing estimating work (not "covered work" under the CBA) and that being paid on a 1099 was the way they wanted to be paid. He asked her for some verification or documentation but she provided none.

11

On August 8, 2002, Helen Struben, on S&S letterhead, responded (Def's Exh. 16) to the

Romolo Report. Her letter read *verbatim* as follows:

> I dispute the Report.
>
> I received the report 8/6/02.
>
> I have audited my records with your findings. I find many differences in the figures. I realize I made some error in reporting hours. I find also the auditor of the examination has also made errors.
>
> We have two scales, commercial & residential. He compiled all hours as commercial, wrong.
>
> I do not intend to pay for employees who do not belong to the union.
>
> At the time the auditor came I wanted to verify my records with him, so we wouldn't have the after effect for the report.
>
> The fee for the report is way out of line. He wasn't here that long, but maybe it would be different in summary at the office.
>
> If I have to pay what you show I will be out of business.
>
> I have all my difference complied [sic] and all in line. I do not intend to pay for another examination for all these differences, to correct the audit. I don not intend to pay service charges orlate fees. It isn't my fault you took so long to make the audit.
>
> We need to get together and get thsi problem solved. I would be more than happy to come to your office with all my records and get this over with.

On September 17, 2002, Helen again wrote to the Funds (Defendant's Exh. 18), *verbatim* as follows:

> Charlotte ask me to send you copies of the differences in the unreported hours for your information for the meeting. There are still a lot of information that is wrong.
>
> We are in the business of selling and installing floorcovering.
>
> Commercial benefits are paid to employees who belong to the union and are paid to install floorcovering from the time they enter a bldg and leave. Local 16 - John Boggs, James Derosa, George Mohr. Local 63 - Rick Guded, John Diegel, Joshua Schraub. Current Employee - Rick Guede.
>
> Residential benefits are paid to employees who belong to the union and are paid to install floorcovering from the time they enter a house and leave. Local 63 - Rick Guede. Curernt Employee - Rick Guede.
>
> Non Union employees no longer belong to the union. Local 63 - Tony Dippel, Local 644A - Wm. Stranz, Beth McGrane, M. Fialkowski. Local 644 - Robert Caulkins, Wm Struben, Charles Smith, Steve Aderholt. Still charged.
>
> Robert Caulkins in is local 1310.

Non Union/never belonged to a union - Ralph Coy, Jimmy Rickey, Todd Beebe, Steve Empson, Jerry Foreman. I am being charged for them. Wrong

Hourly/warehouse employees work receiving, delivery, janitorial, maintenance, etc. they are not installing floorcovering. Still charged.

It appears I have been charged for rates for commercial that should have ben residential.
There is a lot of work still to be done. See you the 24th of Sept.

On September 30, 2002, the auditor Larry Williams wrote to the Funds (Defendant's Exh. 23) in response to Helen's letters. He pointed out that all of Helen's challenges were to union membership, a type of dispute not included in the description of the analysis he was to perform, and to job classifications, which could not be resolved "without more information." He also commented that he could not review the allocation of hours between commercial and residential without knowing which individuals and which months were being questioned.

In October of 2002, S&S was billed for insurance coverage (Plaintiffs' Exh. 27) on vehicles including a 1982 Ford Econoline Van, a 1998 Chevy Silverado Pickup truck, a 1983 Ford E250 van, a 1995 Ford Van E250, and a 2001 Ford F250 truck. The policy period was from September 18, 2002 to September 18, 2003. However, on Dec. 16, 2002, coverage for all vehicles except the 1995 Ford Van and the 2001 Ford truck was deleted. The insurance coverage sheets included with the billing valued the 2001 truck at $25,586 and the van at $15,000. These sheets also showed that "interested parties" were Pekin National Bank and Ford Motor Credit Co.-Retail. Despite court orders to produce loan documents, the Strubens never provided Plaintiffs with copies of any loan documents, nor were they admitted into evidence in the trial.

Also in October of 2002, S&S books show a payment to FPI in the amount of $1,450.88. Randy testified that a tornado had "wiped out a lot of stuff up where the S&S shop was" and he sent some of

13

his employees to help with the cleanup. Once again, there is no documentation supporting Randy's testimony about the type of work that S&S was paying FPI for performing.

The next documented communication between S&S and the Funds occurred nearly a year later. On August 22, 2003, Sue Ann Billimack, an attorney representing S&S, wrote to the Funds a detailed account of the specific challenges that were being made to the audit. The cover letter[2] detailing the challenges was supported with documentation.

The S&S Balance Sheet dated December 31, 2003 (Plaintiffs' Exh.14, p.3) showed that at the end of calendar year 2002, the company owned Fixed Assets of $92,851.63, depreciated to $27,458.33 (including vehicles), and Inventory of $14,740. The un-depreciated Fixed assets were broken down as follows:

> leasehold improvements were valued at $11,308.49
> vehicles were valued at $68,884.95
> Office furniture and equipment was valued at $574.50
> shop equipment was valued at $12,304.02,

During 2003, Helen decided to retire and close S&S. Based on her and Randy's testimony, all S&S company assets were taken to auction on August 29, 2003 where net proceeds (the auction house took a percentage of the gross sale) of $9,670.00 were obtained. There is no documentation or itemization of what exactly was sold. Randy testified that it was office furniture, 2 vehicles, tools,

---

[2]The letter itself was not admitted into evidence. The attached documents were admitted as business records, based on Randy's general characterization of them as such. As discussed below, not all of those records qualify as business records, because they were not contemporaneous records compiled in the ordinary course of business but rather records that were created at the instruction of the attorney for purposes of supporting the challenges. In addition, many of these records contain undated handwritten changes, making reliability questionable at best and characterization as "business records" inappropriate.

shelving and samples (Transcript p.459). The 2003 tax return for S&S shows that a van and a truck were sold on August 29, 2003, one for $2000 and one for $23,903.

The information on the tax return is inconsistent with Randy's testimony that he bought for FPI one of the vehicles and a few miscellaneous tools for $8200. FPI's tax return for 2003 shows that on August 29, 2003 (the date of the auction), FPI placed into service a 2001 van and a 1995 car valued at $11,975. Prior to that date, FPI had owned no vehicles. Randy said that "must have been a mistake" by the accountant (Transcript p.514), because other than the pick up truck purchased at the auction, FPI owned no vehicles at the end of 2003.

After the auction, Helen paid creditors and then distributed the balance to herself and Randy. The creditors who were paid did not include the Funds. Randy testified that since they had heard nothing more from the Funds, "we figured it was dropped." (Transcript p.515). He acknowledged, however, that the Funds never told him that. (Transcript p.542).

One of the creditors who was paid was Summer & Associates, the insurance company that provided coverage to S&S vehicles. On October 16, 2003, more than 6 weeks after the 2 vehicles had been sold at auction, a check in the amount of $1,167.91 was written from the S&S account to the insurance company for coverage on those vehicles. Randy testified that the agency was notoriously late in billing and that this bill was for pre-sale coverage. The insurance documentation does not support Randy's characterization.

At the end of 2003, the Secretary of State of Illinois revoked the corporate status of S&S for failure to file an annual report or to pay the annual franchise tax.

On March 25, 2004, the S&S attorney wrote another letter to the Funds, advising them that Helen had retired and S&S had ceased doing business. Counsel expressed surprise that, despite the

Funds' having done nothing in the 7 months since the August letter, they were once again seeking to collect the delinquencies identified in the audit. The letter states that the company had "reasonably assumed this matter was resolved" and that it had "wrapped up its financial matters as of December 31, 2003." The letter concluded with the threat of litigation about these bad faith claims as well as a request for further appearance to present the company's challenges directly.

Nothing further happened until the Funds filed this lawsuit on March 24, 2005. The original complaint named only Helen Struben, asserting an ERISA claim for breach of fiduciary duty against her. An amended complaint (Doc. #5) added a claim for delinquent contributions against S&S. The second amended complaint (Doc. #33) added an alter ego claim against Helen Struben.[3] During the discovery process, Plaintiffs learned of Randy Struben's company and added that company as a defendant in the Third Amended Complaint (Doc.#66) , which consists of five counts, as follows:

| | |
|---|---|
| Count I: | ERISA: collection of delinquent union fund contributions from S&S |
| Count II: | ERISA: breach of fiduciary duty against Helen Struben |
| Count III: | state law: alter ego claim against Helen Struben |
| Count IV: | state law: single employer claim against FPI |
| Count V: | state law: alter ego claim against FPI |

During the discovery process in this case, Helen eventually - following several court orders - turned over 15 boxes of unsorted documents to counsel for the Funds. Plaintiffs had Williams review those documents. In addition to those documents, Williams reviewed the list of challenges S&S had made to the initial report. Using those sources, even at the late date of September 18, 2008, Williams revised his findings and issued a new report. Some of the documents led to a reduction in the delinquent amount,

---

[3]The second amended complaint also contained another state law claim, which was dismissed by the Court. See Order (Doc. #39) entered 1/22/07.

while others led to an increase. The revised report, including interest and liquidated damages, shows a

total of $56,245.49 owing to the Funds. (Plaintiffs' Exh. 4).

## CONCLUSIONS OF LAW

COUNT I: DELINQUENT CONTRIBUTIONS CLAIM AGAINST S&S

This Count alleges violation of ERISA, 29 U.S.C. §1145, which provides:

Every employer who is obligated to make contributions to a multiemployer plan under the terms
of the plan or under the terms of a collectively bargained agreement shall, to the extent not
inconsistent with law, make such contributions in accordance with the terms and conditions of
such plan or such agreement.

At the summary judgment stage, an employer who fails to maintain adequate records regarding

the amount of contributions owed to union funds has the burden of proving what work was covered and

what work was not covered. Michigan Laborers' Health Care Fund v. Grimaldi Concrete Inc., 30 F.3d

692 at 696 (6th Circ. 1994); Operating Engineers Pension Trusts v. B&E Backhoe Inc., 911 F.2d 1347

at 1354 (9th Circ. 1990); Combs v. King, 764 F.2d 818 at 826 (11th Circ. 1985). That burden, however,

does not strictly apply once a case goes to trial. Chicago Dist. Council of Carpenters Pension Fund v.

Reinke Insulation Co., 347 F.3d 262, 265 (7th Cir. 2003). As always, at trial the plaintiff bears the burden

of proof.

But an employer cannot escape liability "by hiding behind his failure to keep records as statutorily

required." Brick Masons Pension Trust v. Indus. Fence & Supply Inc., 839 F.2d 1333, 1338 (9th Cir.

1988), quoted in Plumbers & Pipefitters Local 99 Fringe Benefit Funds v. Watkins, -- F. Supp. 2d --, No.

05-1223, June 5, 2008 (C.D. Ill.)(Mihm, J.). Brick Masons relied on Anderson v. Mt. Clemens Pottery

Co., 328 U.S. 680 (1946), a case in which an employer failed to keep records required by the Fair Labor

Standards Act. The Anderson Court rejected the employer's argument that the employee had failed to

17

meet his burden of proving certain damages, where that proof would have been possible had the employer kept proper records. The fact of damage was certain; it was only the amount that was uncertain, and, the Court concluded, "it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." Anderson, 328 U.S. at 688. All that is required under those circumstances is "a basis for a reasonable inference as to the extent of the damages." Id.

Applying those principles, the Court in Brick Masons held that an employer who failed to keep proper ERISA-required records was liable to pay contributions for *every* hour worked by an employee who had performed *any* covered work at all during the audit period. 839 F.2d at 1339.

These general rules of ERISA law were re-stated without criticism by the Seventh Circuit in Laborers' Pension Fund v. A&C Environmental, Inc., 301 F.3d 768 (7th Cir. 2002). The A&C Court went on, however, to point out that, in the case before it, the employer's records were adequate to determine the amount that was delinquent. Application of the burden shifting analysis was hence improper, and in the absence of proof, the fund was not entitled to judgment on the issue of damages. The case was remanded for determination of damages.

So, what is meant by adequate records? In Trustees of Chicago Painters and Decorators Pension, Health and Welfare Fund v. Royal Internat'l Drywall and Decorating, Inc., 493 F.3d 782 (7th Cir. 2007), the Court concluded that time sheets kept by the employer did not satisfy the duty to maintain records, for two reasons: (1) only a few time sheets were recorded daily; the majority were completed weekly; and (2) other evidence raised suspicion that weekly totals were inaccurate. See also Reinke, 347 F.3d at 262, 264 (7th Cir. 2003) (to be sufficient, records must be reliable and contemporaneous); Laborers' Pension Fund v. RES Envtl. Svc., 377 F.3d 735, 739 (7th Cir. 2004)(records must demonstrate accuracy in

recording the work performed). Here, there were no time cards at all - or any other type of contemporaneous record of time and type of labor - located for the employees whose time is in dispute. The only records of hours worked are the payroll summaries prepared by Helen Struben. Those summaries do not show what type of work was being performed for what particular job. Many of the summaries submitted as business records were incomplete or had handwritten alterations shown on them. Randy and Helen both admitted that these records contained some errors. All in all, these records were for the most part not reliable to show errors or flaws in the Romolo report.[4] To the extent that they were reliable, I find that Williams, the author of both the original and the amended report, took those records into account when he amended the report.

The only other evidence in the record to indicate what work various employees performed was the testimony of Helen and Randy Struben, who claimed at trial in late 2008 to be able to recall the details about the specific type of work performed on particular dates six to ten years earlier. Such testimony based on memory alone, with no supporting documentation, is simply not credible.

I further find no basis for Helen's and Randy's insistence that they were not obligated to make contributions on behalf of non-union members who performed covered work. The CBA expressly provides that it covers "all employees employed by the Employer engaged in work coming under all classifications" of covered work. The CBA prohibited S&S from utilizing non-union workers for covered work, and if such workers were used, the CBA required that they be treated exactly like union members

---

[4] I also note that there was no testimony whatsoever about the following names in the 2008 report: John Boggs, James Derosa, Tony Dippel, George Mohn, Charles Smith, Steve Aderholt, Andrew Dewees, Michael Ennis, Joshua Schraud, and Erik Loy. I therefore presume there is no objection to the conclusions drawn by Williams as to the amounts due based on the hours they worked.

with respect to pay, benefits and contributions to the Funds. To the extent that the Defendants position is that no contributions are due for non-union employees performing covered work, I reject that position.

It is unclear whether that was truly Randy's position. At times, it appears that he was arguing that no contributions were due when non-union workers performed work that was not covered work under the CBA. That is a true statement as far as it goes, but there is absolutely no documentation whatsoever that the Romolo reports contained any such hours. Only Randy and Helen's testimony is offered to support that argument. The dearth of records dooms the argument.

Similarly, I found incredible and lacking in factual support the assertion that residential work was not covered by a collective bargaining agreement that bound S&S. While it is true that there is not a separate residential agreement[5] in evidence, it is also true that the business records of S&S demonstrate that S&S paid contributions for residential work throughout the audit period. Helen's own letters to the Funds following the audit reveal her clear understanding that such contributions must be made.

S&S also questions inclusion in the Romolo report of hours spent installing ceramic tile. I agree with Randy that ceramic tile installation does not fall within the "scope of work" defined in the CBA; only tile that would fall into one of the other categories (such as resilient floor covering) would be included in the definition. That said, however, I do not believe it resolves any issue now before this Court. Randy testified that two employees - Jimmy Rickey and Ralph Coy - performed ceramic tile work in 1998. Although handwritten payroll records (Def.'s Exh. 11A, section T) show that those two

---

[5]It is not even certain that there was such a separate agreement. There is language in the CBA quoted herein that strongly suggests residential work is incorporated. See, e.g., Section 7, defining "Floor Covering Scope of Work as including "installation" in "houses and apartments." Whether it was through the CBA presented to the Court or through some separate CBA that was not introduced into evidence, I find that the business records of the Defendant establishes that residential work was covered work.

employees performed 30 hours of "tile" work in 1998, nothing in that exhibit establishes that the "tile" work was ceramic tile. I find it incredible that Randy's memory at trial was good enough to recall the precise nature of work done 10 years earlier by two of the dozens of S&S employees. The CBA specifically references "tile" in Section 6, but even if that reference is limited to resilient floor tile, there is nothing to support Randy's recollection that the tile in question was ceramic, not resilient. There is no other documentary evidence on this question.[6]

To the extent that S&S hired "subcontractors" who were in reality union members performing covered work, I find that such a practice was a blatant effort to make an end run around the obligations S&S undertook when it entered into the CBA. Simply calling someone a subcontractor does not make it so. In fact, an employer-employee relationship may be found even though the parties define their relationship as one of principal-independent contractor if enough of the indicia of a master-servant relationship are present. See, Estate of Suskovich v. Anthem Health Plans Of Virginia, Inc. , -- F.3d --, Case. No. 08-1070, 2009 WL 140494, 4 (7th Cir. 2009); Stone v. Pinkerton Farms, Inc., 741 F.2d 941 (1984). Parties to a contract have the freedom to define their relationship as one of principal and independent contractor only if other factors do not support a finding of an employer-employee relationship. Stone, 741 F.2d at 945.

ERISA cases use a 12-factor common law standard to determine if a party to a lawsuit was an employee under the act. The Supreme Court has held that this standard is similar to the 10-factor Restatement test. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-24 (1992); Suskovich, 2009

---

[6]Defendants also point the Court to Plaintiffs' Exhibit 13, which is a check register for S&S, arguing that they paid contributions to Bricklayers for ceramic tile work. However, pages 6 and 15 show payments to Bricklayers in 2003, which is wholly irrelevant to hours worked in 1998. The mere fact of payment tells the Court nothing, and no further explanation was made.

WL at *5. Under the Restatement test, a court examines the following factors: (1) the extent of control which the master exercises over the details of the work; (2) whether or not the one employed is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the person is employed; (7) the method of payment, whether by the time or by the job; (8) whether or not the work is a part of the regular business of the employer; (9) whether or not the parties believe they are creating the relationship of master and servant; (10) whether the principal is or is not in business. Suskovich, 2009 WL 140494, *6; see also Restatement (Second) of Agency § 220.

In this case, Randy, on behalf of S&S, told the individuals where the job was, what the details of the job were (i.e. what type of covering). The actual installation was unsupervised, but that was also often the case with experienced employees of S&S. The extent of control was neither more nor less than would be expected given the experience of the individuals who were treated as though they were subcontractors.

While the individuals in question were certainly employed in an occupation that can be distinctly defined, it is the type of occupation that had historically been performed by employees of S&S. Indeed, employees of S&S continued to perform identical work functions throughout the audit period. These functions were manual skills learned on the job: estimating time and laying the floor covering. These functions did not require anything other than on-the-job training and on-the-job experience.

Here, the place of work (i.e. a specific job site) was provided by the employer. These individuals did not go out and find their own installation jobs; those were referred to the individuals by S&S. S&S

22

also ordered the floor covering, stored the floor covering, and delivered it to the job site. Randy testified that the tools of the trade were owned by the individuals who were hired to do the work.

Each of the individuals in question had been a previous employee of S&S. Once "retired" from S&S, however, their involvement with S&S was on an installation-by-installation basis. Unlike other individuals who were considered "employees," these "subcontractors" were not assigned other work, such as warehousing or maintenance, when there was no installation job for them.

While these individuals were paid on a job-by-job bases and not by the time actually spent, the cost of the job was based in pertinent part on how much time the estimator expected to spend installing the flooring. Moreover, the method of payment was determined by the individual: if he wanted to be paid on a 1099, that's how S&S paid him. If he preferred a W-2 payment, that's how he was paid.

Whether the work these individuals preformed was a part of the regular business of S&S is not even a question here. Clearly installation of floor covering was the primary - or sole -business of S&S. Likewise, there is no question that the principal - S&S - was in the business through the entire audit period.

Finally, I find that the parties knew their relationship was one of master and servant. They simply created external, superficial trappings so they could nominally refer to it as some other type of relationship, thereby circumventing contractual obligations to the Funds.

In summary, while there are a few factors that might suggest a subcontractor relationship, I find that the majority of the testimony and documents in this case belie that conclusion. S&S was obligated by its CBA's (i.e. both commercial and residential) to utilize only union labor for covered work, and further to make contributions according to the trust documents for all hours spent in that pursuit. Calling installers "subcontractors" does not avoid those obligations.

For each of these reasons, I conclude that the Funds were entitled to collect from S&S contributions based on total hours worked by any person who was paid by S&S to perform any covered work during the audit period. There is absolutely no documentation that would establish which of those hours were commercial and which were residential.

The records of S&S were inadequate and did not meet the obligation imposed by ERISA that an employer "maintain sufficient records." The records were wholly missing in some respects (time cards and job descriptions, for example), and missing or incomplete in others (job assignments and residential vs. commercial). The precise amount of damages could have been ascertained had S&S met their burden to maintain these records. In the absence of records, I find it proper to infer from the facts presented at trial the amount of delinquent contributions, at the commercial rate, as reflected in the second Romolo Report. That amount is $32,294.04. I likewise conclude that the second Romolo Report properly included and calculated audit costs of $3,478.50; liquidated damages in the amount of $6,458.93; and interest in the amount of $17,492.52.

Plaintiffs are, under the CBA, also entitled to an award of attorney fees; counsel is directed to submit an affidavit of fees with supporting documentation within 14 days. Defendant may respond to the attorney fee calculation and documentation within 14 days thereafter.

COUNT II: BREACH OF FIDUCIARY DUTY CLAIM AGAINST HELEN STRUBEN

Helen Struben was the President of S&S. In that capacity, she was involved in the "winding up" of the affairs of S&S, including the liquidation of the company's assets. At that time, she was aware that the Romolo audit had disclosed a claim for delinquent contributions. Although she disputed the accuracy of that report, she conceded that she had made some errors and owed the Funds some amount. In the

24

winding up process, she paid other creditors, but because there was no agreed resolution of the issues generated by the Romolo audit, no payment was made to the Funds. The balance of liquidated assets was distributed to Helen Struben and to her son Randy. Defendants argue that she was a fiduciary under ERISA who breached her duty.

An ERISA claim for breach of fiduciary duty requires proof that the defendant is a fiduciary, that defendant acted with respect to an ERISA plan in some way covered by ERISA, that a fiduciary duty imposed by the statute was breached by that act, and that the act caused damage or loss to the Plan. Jenkins v. Yager, 444 F.3d 916, 924 (7th Cir. 2006). In an earlier Order in this case, Helen Struben was found to be a functional ERISA fiduciary, but only to a limited extent. See Order and Opinion, entered Oct. 18, 2007 (Doc. #58). The scope of her fiduciary duty was defined by the amounts that were actually withheld from employee pay for the purpose of making contributions to the Funds. To the extent those withheld contributions were not paid over to the Funds, Helen Struben breached that duty. Plaintiffs assume that because Struben was a fiduciary as to one area, she was a fiduciary as to all areas. That is incorrect. It is only to the extent that those actual withholdings were *not paid over to the Funds* that a breach of her fiduciary duty occurred.

Plaintiffs' evidence showed that deductions were taken from employee pay throughout the audit period. The evidence, however, also shows regular reporting to the Funds. The Funds submitted no evidence at all and has made no argument that there is a difference in the amounts withheld and the amounts paid to the Funds.

I conclude, therefore, that the Funds have failed to meet their burden of proof with respect to this Count. As to Count II, I find in favor of Helen Struben and against the Funds.

COUNT III: ALTER EGO CLAIM AGAINST HELEN STRUBEN

ERISA does not expressly provide for liability of a corporate officer who has not personally committed to the collective bargaining agreement. Plumbers' Pension Fund v. Niedrich, 891 F.2d 1297 (7th Cir. 1989); Levit v. Ingersoll Rand Fin. Corp., 874 F.2d 1186, 1193-94 (7th Cir. 1989). State law controls the issue of when the corporate veil may be pierced. Levit, 874 F.2d at 1193-94; Niedrich, 891 F.2d at 1301; Chicago District Council of Carpenters Pension Fund v. Sunshine Carpet Svcs., 866 F. Supp. 1113, 1118 (N.D.Ill.1994). When the corporate veil is pierced, an individual owner is deemed to be the "alter ego" of a corporation and hence may be liable for corporate obligations. The corporate veil may be pierced more easily in ERISA cases than in pure contract cases, to assure the promotion of the federal policies underlying ERISA. Lumpkin v. Envirodyne Industries, Inc., 933 F.2d 449, 461 (7th Cir. 1991).

Under Illinois law, there are two requirements for piercing the corporate veil:

First, there must be such unity of interests and ownership that the separate personalities of the corporation and the individual no longer exist; and second, circumstances must be such that an adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.

Lumpkin, 933 F.2d at 463-64, quoting Koch Refining v. Farmers Union Central Exch. Inc., 831 F.2d 1339, 1345 (7th Cir. 1987), certiorari denied, 485 U.S. 906. See, Gallagher v. Reconco Builders, Inc., 415 N.E.2d 560, 563-54 (Ill.App.1980).

Unity of interest and ownership may be shown by evidence of several factors, although no single factor is determinative. Those factors include misrepresentation; commingling of funds, assets, or identities; inadequate capitalization; failure to operate at arm's length; and failure to comply with corporate formalities; Koch Refining, 831 F.2d at 1345, citing Main Bank v. Baker, 427 N.E.2d 94, 102 (Ill.1981); as well as failure to issue stock; non-payment of dividends; insolvency of the corporation; non-

functioning of other officers or directors; absence of corporate records; diversion of assets by or to a shareholder to the detriment of creditors; failure to maintain arm's length relationships among related entities; and whether in fact the corporation is a mere facade for the operation of the dominant stockholders. See, Fontana v. TLD Builders, Inc., 840 N.E.2d 767 (Ill.App. 2005).

The Seventh Circuit has cited with approval three general factors that the Ninth Circuit has identified in determining whether underlying objectives of the alter ego doctrine have been satisfied: (1) the amount of respect which the shareholders give to the separate entity; (2) the fraudulent intent involved; and (3) the amount of injustice which parties would suffer by respecting the corporate entity. Lumpkin, 933 F.2d at 461, citing Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc.,736 F.2d 516 (9th Cir.1984). The more specific factors evaluated under Illinois law easily fit within those three general categories, and because there is so much overlap between and among the specific factors, using these categories makes discussion easier and clearer. I find first Helen did not respect legal formalities that arise from the corporate structure of S&S. First, S&S was definitely undercapitalized. "Undercapitalized" means that the company has failed to set aside "unencumbered capital reasonably adequate for the corporation's prospective liabilities." Fontana, 840 N.E.2d at 779. To determine whether capitalization is adequate, "one must compare the amount of capital to the amount of business to be conducted and obligations to be fulfilled." Fiumetto v. Garrett Enterprises, Inc., 749 N.E. 2d 992, 959 (Ill.App. 2001), quoted in Fontana, 840 N.E.2d at 779.

The evidence in this case indicates that only $8528 was put into S&S as capital: Helen's initial capital investment of $7500 and another $1028 shown by the accountant. In 2001, S&S purchased over $500,000 in goods and materials; at then end of the year the company's liability exceeded $200,000.  In 2002, the purchase of goods and materials decreased to about $400,000; its end of year liability, however

27

increased to $240,000. (Plaintiffs' Exh. 2, p. 2 and 14). While $7500 may have been adequate at the outset of this business, by 2001, S&S was indeed undercapitalized.

Loans by the shareholder to the company, without corporate resolutions authorizing that debt, is one indicia of failing to observe corporate formalities. <u>Fontana</u>, 840 N.E.2d at 780. Evidence also shows that Helen made several personal loans to the company (Plaintiffs' Exh. 2, p. 4 and 14). A significant part of the company's liability at year end 2001 (over $30,000) was for loans from shareholders, mortgages and notes payable. There is no underlying documentation of these supposed loans; they simply appear in summary form in the company's year end financial statements and/or tax returns. The information contained in those documents was provided by Helen to the accountant, and he testified that he conducted no further examination of records. He simply accepted what information was given to him and incorporated it into those reports.

This was not the only evidence of the casual nature with which Helen treated the corporate structure of S&S. No actual shares of stock were ever issued, and the company never recorded the payment of any dividends. The company lacked certain fundamental records, such as fixed asset lists, equipment records, vehicle records, job cost reports, and time cards. Indeed, had these documents been prepared and available, the need for this litigation may very well have eliminated. With proper records, there would be no doubt what work each worker performed on each date and the value of the assets owned by the company.

While there was testimony from the accountant (based on Helen's personal tax returns) about her meager salary, there is also evidence that she paid to herself rather significant amounts from the company during the last year of operation. Plaintiffs' Exhibits 13 and 18 show a total of nearly $30,000 paid by company check to Helen in 2004, over and above her salary. In addition, the accounts receivable for the

company at the end of 2003 were over $25,000; by April 9 of the following year, they were down to $9,900. There is no accounting for where that money went, other than Randy's testimony that Helen had "worked fairly cheap all these years" and that she was getting money out of the company. (Transcript p. 515).

Moreover, many of Helen's decisions and actions benefitted members of her family, even if they did not benefit her directly. Over and above his wages, Randy was paid over $10,000 in 2003, without explanation. Helen agreed to make and did make over $11,000 in improvements to property owned by Randy Struben, improvements that stayed with the property. There were lease and rental agreements that benefitted Randy and/or his companies in unexpected ways - such as S&S paying the property taxes on property owned by Randy's company, or Randy's company renting rather significant amount of space at Helen's farm for rather paltry amounts - without any written documentation to formalize these agreements.

Then there is the question of disposition of the vehicles owned by S&S at the time of the auction. Less than one year after these two vehicles were valued at over $38,000 and flying in the face of the value placed on these assets in the corporation's tax returns, the vehicles were sold at auction (one of them to Randy) for under $10,000. And S&S continued to pay insurance on these two vehicles months after they were supposedly sold, casting considerable doubt on Helen's and Randy's memories about what was sold when to whom. No titles or loan documents were produced by S&S, Helen or Randy, although they were ordered to produce the loan documents.

The company never formally dissolved following statutory procedures required by the Illinois Business Corporations Act (805 ILCS 5/1 *et seq*.). Directors of a corporation are obligated under that Act to provide notice to all creditors; failure to do so leaves the director jointly and severally liable to the

29

creditor. 805 ILCS 5/8.65(2). The Act also prohibits distributions to shareholders if the distribution renders the corporation insolvent. The distributions to Helen and to Randy rendered S&S insolvent, leaving it with neither liquid nor fixed assets at a time when debt existed. The Act provides that any distribution prohibited by the Act leaves the director liable to the corporation for the amount of that distribution.

Helen knew that the company owed the Funds some amount. Even though those delinquencies were disputed, and even though the Funds took an inexplicable 7 months to respond to the S&S challenge to the Romolo report, distributing company assets before notifying and paying the Funds was at best an irresponsible business decision and at worst a deliberate act of defiance. Either way it was clearly not in compliance with the statute that governs corporate conduct. As such it is further demonstration of the lack of separation between Helen and S&S.

All in all, I find that there was significant evidence that S&S was treated by Helen as an arm of her family. S&S may have originally been established for a proper purpose (promoting the best interests of the corporation itself is a legitimate purpose; see Jacobs v. Xerox Corp., 520 F.Supp. 2d 1022, 1036 n.10 (N.D.Ill. 2007)), but that interest changed after the Romolo report. The primary goal thereafter became looking out for the best interests of Helen and her family.

By choosing the corporate form, Helen gave up the right to operate her business as a sole proprietorship. She could not simply close up shop without adhering to corporate formalities, and she could not simply ignore corporate debt in order to pay the sole shareholder (herself). In essence, that is what she did. Where there are solvent members of an insolvent corporation that has not fulfilled its obligations under ERISA, the policies underlying ERISA favor disregarding the corporate entity. Having

chosen the benefits of a corporate form for S&S, its President Helen Struben was bound to adhere to the legal obligations of that legal form. She failed to do so.

The second category of factors relates to fraud or wrongdoing sanctioned by the shareholders or other conduct promoting an injustice. Koch Refining v. Farmers Union Cent. Exchange, Inc., 831 F.2d 1339, 1345 (7th Cir. 1987). The Supreme Court has stated that the "doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice." Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 322 (1939), quoted in Lumpkin., 933 F.2d at 463. "If justice would be served and potential fraud nullified, then plaintiffs should be able to proceed against the party that has actual control" of the corporation by piercing the corporate veil. Id. at 461. The presence or absence of fraud or injustice (which includes "intentional wrongdoing, Lumpkin, 933 F.2d at 463) is determined by "an individualized inquiry" of the specific factual issues presented. Lumpkin, 933 F.2d at 463; see also Koch, 831 F.2d at 1345.

In this case, I find that there was deliberate misconduct by Helen Struben. The evidence is clear that she participated in a course of conduct whereby S&S (1) did not make contributions to the Funds for non-union employees doing covered work; (2) used the facade of "subcontractor" to mask what was truly an employer/employee relationship; and (3) used FPI, a non CBA signatory, to perform covered work. It is fair to infer from all the evidence in this case that Helen knew this conduct was wrong. Contributions had been paid for residential work in the past, so Helen knew that shunting that work to FPI or to "subcontractors" would harm the Funds and violate contractual obligations.

Even if it was lack of comprehension and not deliberate misconduct that led Helen to believe that covered work - not union membership - precipitated the duty to make contributions to the Fund, that

ignorance does not excuse the misconduct. If Helen did not know, as a contract signatory she should have made efforts to learn. She did not. Instead, she figuratively stomped her feet and refused to pay.

Finally, I see no injustice in allowing the Funds to pierce the corporate veil under these circumstances. Helen personally benefitted when the company assets were liquidated, and the Funds were deliberately shortchanged at the same time. While I do not doubt that Helen's finances will suffer greatly by this ruling, she brought that hardship upon herself by the way she ran S&S and, more particularly, by the way she wound up the company's affairs. The injustice that would accrue to the Funds - and to all participants and beneficiaries of those Funds - outweighs any hardship to an individual employer under these circumstances.

To honor the corporate separation would, under these circumstances, perpetrate one of the injustices that ERISA was designed to eliminate, namely the endangering of workplace benefits by employer misconduct. There is a federal interest in ignoring the corporate form to impose liability in cases concerning employee benefits governed by ERISA. See, <u>Lumpkin</u>, 933 F.2d at 460. I find that justice would be served and potential fraud nullified by allowing the Funds to pierce the corporate veil of S&S and attribute the company's liability to the individual - Helen Struben - who had actual control of that company.

<u>COUNT IV - ALTER EGO CLAIM AGAINST FPI and
COUNT V - SINGLE EMPLOYER CLAIM AGAINST FPI</u>

The legal bases of these two claims are similar, so they will be considered together. They are not, however, identical.

Generally, one corporation is the alter ego of another where the factors necessary to support a "single employer" finding are met *and*, in addition, the second corporation is found to be merely a

"disguised continuance" of the employing enterprise, resulting in evasion of the employer's obligations under the labor laws. <u>Trustees of Pension, Welfare and Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co.</u>, 995 F.2d 785, 788 -789 (7th Cir.1993). Thus, it is first necessary to determine whether FPI and S&S were in legal reality a single employer. If they were, then it will be necessary to go on to consider whether FPI was nothing more than an alter ego of S&S; if they were not a "single employer," then there is no need to consider the alter ego claim.

The single employer theory examines two nominally separate corporations to determine if they are in fact a single employer. This determination is to be based on the totality of the circumstances, as demonstrated by four factors: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. <u>South Prairie Constr. Co. v. Internat'l Union of Operating Engineers</u>, 425 U.S. 800, 803 (1976). No one factor is determinative: the decisionmaker must weigh the totality of the circumstances. <u>Esmark Inc. v. NLRB</u>, 887 F.2d 739, 753 (7th Cir. 1989).

In this case the evidence is absolutely clear that before FPI began installing residential flooring, these two companies were operated as separate entities.  Their payroll, financial statements, taxes and other records were maintained separately.  Helen ran S&S;  Randy ran FPI.  FPI was in the business of selling supplies to other installers, while S&S was an installer.  There simply was no overlap.

Once FPI began installing flooring, the relationship between the two companies became closer.  S&S began referring some residential jobs to FPI, and Randy served as supervisor on job sites for both companies.  But the two companies maintained  separation of operations.  There was no evidence that FPI paid S&S anything for the referrals, for example, or that S&S maintained some sort

of control over these jobs.  Once FPI took over a job, S&S had no more involvement in that particular job.  Randy's increasing involvement in managing S&S corresponded with Helen's decrease in health.  All in all, I find insufficient evidence of overlap in operations to draw any negative conclusion about FPI.

More significant questions arise about the lease arrangements between the two companies.  The lease of the Pekin property by S&S benefitted Randy Struben and his property company, and the lease of the Pekin warehouse location by FPI benefitted Helen Struben individually.  S&S made significant capital improvements to the Pekin property, improvements that remained with the property once S&S closed shop, accruing to the benefit of Randy.     But the Plaintiffs have offered no testimony and have cited no law to support the inference they would have the Court draw:  that the terms of the leases - the amount of rent or other provisions such as payment of real estate taxes - are uncommon in this industry or in this area, or that it is improper for a business to improve its leasehold.  I decline to draw a negative inference from the leases.

Questions about the interrelationship of these businesses arose most obviously when S&S began winding up its business, with Randy taking what appeared to be a leading role in that process.  Assets that were on the books of S&S vanished, without any paper trail or financial records.  But the Plaintiffs failed to show that those assets were somehow conveyed to FPI.  It is true that Helen was less than forthcoming during the discovery process.  It is also true that the Plaintiffs failed to capitalize on that fact.  The burden of proving that the assets went to FPI.

 The Plaintiffs rely on several other pieces of isolated evidence.  First, the Plaintiffs showed that Helen signed the mortgage for the Pekin property.  But that property was owned by Struben Properties, not by FPI.  It is therefore irrelevant to the single employer analysis.  Second, Plaintiffs

point out that the S&S check register shows payment of a rather significant amount (approximately $10,000) to Randy Struben during the last year of S&S existence.  Once again, however, those amounts were paid to Randy, not to FPI, so they are irrelevant for purposes of the single employer analysis

There was never *de facto* common ownership. Helen owned her company, and Randy owned his. While the fact that two companies are owned and controlled by members of the same family may be considered as evidence of common ownership, see, <u>Favia</u>, 995 F.2d at 788; <u>Central States, Southeast and Southwest Areas Pension Fund v. Sloan</u>, 902 F.2d 593,596 (7th Cir. 1990), that factor alone cannot be enough.

While the Plaintiffs surely raised questions about the relationship between S&S and FPI,  the Plaintiffs did not meet their burden of proving that the two companies were a single employer. As noted at the outset of this section, because FPI and S&S were not a single employer, it is not necessary to consider whether FPI was an alter ego of S&S.  As a matter of law, it was not.

<u>DAMAGES</u>

The Judgment in this case arises out of the lack of reliable records.  It must be noted, however, that the sorry state of the records produced at trial is attributable not only to the Defendants' failure to maintain and produce those records but also to the Plaintiffs' less than diligent efforts to review and obtain those records. The Plaintiffs knew for years that there was a problem with the accounting at S&S, and they knew for months that S&S disputed the Romolo report.  The failure of the Funds to act in a more expedient fashion is subject to criticism.  Surely these Funds must have some ongoing responsibility to view and review employer records and act in a timely and businesslike fashion.

Nonetheless, the failure to keep the records in the first place is attributable to S&S and its owner, Helen Struben.  The records of S&S do not constitute sufficient records to determine the actual amount of benefits payable to the Plaintiffs. In many cases, there are no records at all documenting the type of work performed by employees. Many jobs lack specific hourly documentation altogether.  S&S cannot be heard to complain that damages lack the exactness and precision of measurement that would be possible had records been kept in accordance with the requirements of ERISA.

Nor is an award of damages under these circumstances precluded by the rule that bars recovery of uncertain and speculative damages. That rule applies only to situations where the fact of damage is itself uncertain. Here, where the damage is certain and the uncertainty lies only in the amount of damages arising from the statutory violation, it would be a perversion of fundamental principles of justice to deny all relief to the Funds and to relieve the Defendants from making them whole. "It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 688 (U.S. 1946).

The Court will therefore make an evidentiary inference based on the Funds' audit to make a "just and reasonable estimate" of damages. I conclude that the Funds are entitled to the entire amount of the September 2008 Romolo Report from S&S. None of the evidence or testimony produced by Defendants was sufficient to negate any part of that Report.  The amount shown in the Romolo Report is $56,386.39.  Because Helen Struben has been found an alter ego of the corporation, I find that she is also individually liable for that amount.

**CONCLUSION**

Memories fail and memories deceive. That is why contemporaneous records are demanded by Illinois law, by ERISA, and by collective bargaining agreements. Failure to maintain these documents by S&S cannot be cured by Helen's and Randy's memories alone. Their assertion that they were never told what documents to keep does not excuse the failure. The obligation to inquire arose when corporate structure was chosen and when contracts were executed.

The Clerk is directed to enter Judgment in a civil case, as follows:

Count I: The Funds have proven their case against S&S. Judgment is therefore entered in favor of Plaintiffs and against S&S on Count I in the amount of $56,386.39 plus attorneys fees. Counsel is directed to submit an affidavit of fees with supporting documentation within 14 days. Defendant may respond to the attorney fee calculation and documentation within 14 days thereafter.

Count II: The Funds have failed to prove that Helen Struben breached her fiduciary duty. Judgment is therefore entered in favor of Helen Struben and against Plaintiffs on Count II.

Count III: I find that Helen Struben was an alter ego for S&S. Judgement is therefore entered in favor of Plaintiffs and against Helen Struben on Count III in the amount of $56,386.39.

Count IV: I find that FPI and S&S were not a single employer. Judgment is therefore entered in favor of the FPI and against the Plaintiffs.

Count V: I find that FPI was not an alter ego of S&S. Judgment is therefore entered in favor of FPI and against the Plaintiffs.


ENTERED ON February 24, 2009

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE